**WILLIAM H. PRUITT, ESQ.**
Nevada Bar No. 6783
**JOSEPH MESERVY, ESQ.**
Nevada Bar No. 14088
**SEAN DEROEST, ESQ.**
Nevada Bar No. 16224
**BARRON & PRUITT, LLP**
3890 West Ann Road
North Las Vegas, Nevada 89031
Telephone: (702) 870-3940
Facsimile: (702) 870-3950
Email: bpruitt@lvnvlaw.com
Email: jmeservy@lvnvlaw.com
*Attorneys for Defendants*
*USHEALTH Advisors, LLC, and*
*Freedom Life Insurance Company of America*

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN ROAD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBERT KENT WALLS an individual;<br><br>Plaintiff,<br><br>vs.<br><br>CONNOR FERST; FERST CHOICE INSURANCE LLC.; USHEALTH ADVISORS, LLC; FREEDOM LIFE INSURANCE COMPANY OF AMERICA; DOES I through X; and ABC CORPORTATIONS A-Z; inclusive,<br><br>Defendant. | Case No:<br><br>**PETITION FOR REMOVAL** |

TO: THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA, Petitioners, USHEALTH Advisors, LLC, and Freedom Life Insurance Company of America respectfully show this Court:

1. Petitioners, USHEALTH Advisors, LLC, and Freedom Life Insurance Company of America, are Defendants in the above-entitled action pursuant to a Complaint filed in the 8th Judicial District Court, Clark County, Nevada ("State Court") on February 27, 2026, entitled *Robert Kent Walls v. Conner Ferst, Ferst Choice Insurance LLC., USHEALTH Advisors, LLC., and Freedom Life Insurance Company of America,* (Case No. A-26-940497-C). A copy of Plaintiff's Complaint is attached as **EXHBIIT A**.

2. Plaintiff's Summons and Complaint in the State Court action were served on Petitioners on March 31, 2026. Copies of the affidavits of service are attached as **EXHIBIT B**.

3. The above-entitled matter is a "civil action" that might have been brought originally in federal court, and is removable under 28 U.S.C. §1441(a) from State Court to this United States District Court based upon diversity of citizenship of the parties; upon information and belief, Plaintiff claims exceed this Court's jurisdictional minimum of $75,000. *See* 28 U.S.C. §1332(a)(1).

4. According to Plaintiff's Complaint, Plaintiff asserts that Defendants engaged in misrepresentation and unfair practices relating to the issuance of an insurance policy. Furthermore, Plaintiff seeks damages "in excess of $15,000.00," and an award of punitive damages. See **EXHBIIT A**.

5. Defendant Conner Ferst is a citizen of the state of Florida.

6. Petitioner USHEALTH Advisors, LLC., is a Texas-domiciled corporation with its principal place of business in Grapevine, Texas.

7. Petitioner Freedom Life Insurance Company of America is a Texas-domiciled corporation with its principal place of business in Fort Worth, Texas.

8. Defendant Ferst Choice Insurance LLC was a Florida-domiciled corporation with its principal place of business in Tampa, Florida.

9. Plaintiff Robert Kent Walls is a citizen of the State of Nevada.

10. This Petition for Removal is filed within thirty days of the action being removable. *See* 28 U.S.C. §1446(b)(1).

11. Copies of all remaining pleadings in the Petitioners' control are attached as **EXHIBIT C**.

///

///

///

///

///

///

///

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN ROAD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

BARRON & PRUITT, LLP
ATTORNEYS AT LAW
3890 WEST ANN ROAD
NORTH LAS VEGAS, NEVADA 89031
TELEPHONE (702) 870-3940
FACSIMILE (702) 870-3950

WHEREFORE, Petitioners pray that the above-entitled action be removed from the Eighth Judicial District Court for County of Clark, State of Nevada, to the United States District Court for the District of Nevada.

BARRON & PRUITT, LLP

*/s/ William H. Pruitt*

WILLIAM H. PRUITT, ESQ.
Nevada Bar No. 6783
JOSEPH R. MESERVY, ESQ.
Nevada Bar No. 14088
3890 West Ann Road
North Las Vegas, NV 89031
*Attorneys for Defendants*
*USHEALTH Advisors, LLC, and*
*Freedom Life Insurance Company of America*

# EXHIBIT A

EXHIBIT A

EXHIBIT A

Electronically Filed
2/27/2026 3:37 PM
Steven D. Grierson
CLERK OF THE COURT

Patrick R. Leverty, Esq.
Nevada Bar No. 8840
LEVERTY & ASSOCIATES LAW CHTD.
3100 W Charleston Blvd., Suite 200
Las Vegas, NV 89102
Ph. (702) 507-0201

MAILING ADDRESS
608 Lander Street
Reno, NV 89509
Ph. (775) 322-6636
Facsimile: (775) 322-3953
*Attorney for Plaintiff Robert Kent Walls*

CASE NO: A-26-940497-C
Department 23

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| ROBERT KENT WALLS an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CONNOR FERST; FERST CHOICE INSURANCE LLC; USHEALTH ADVISORS LLC; FREEDOM LIFE INSURANCE COMPANY OF AMERICA; DOES I through X; and ABC CORPORATIONS A-Z; inclusive,<br><br>Defendants. | Case No.:<br><br>Dept No.: |

**COMPLAINT**

**(EXEMPTION FROM ARBITRATION – PUBLIC POLICY)**

Plaintiff, Robert Kent Walls, by and through his attorneys of record, Leverty & Associates Law Chtd., allege and aver against the above-entitled Defendants as follows:

**JURISDICTION AND VENUE**

1. Robert Kent Walls (hereinafter "Walls" or "Plaintiff") is an individual domiciled in the State of Nevada.

2. Defendant USHEALTH Advisors, LLC ("USHEALTH Advisors") is a Texas-domiciled corporation with its principal place of business in Grapevine, Texas. USHEALTH Advisors is a captive national sales organization affiliated with USHEALTH Group, Inc. and, at all relevant

times, marketed, solicited, and sold health-related insurance products and memberships to Nevada residents, including Plaintiff.

3. Defendant Freedom Life Insurance Company of America ("Freedom Life") is a Texas-domiciled corporation with its principal place of business in Fort Worth, Texas. Freedom Life is licensed to conduct the business of insurance in Nevada and, at all relevant times, underwrote, issued, and administered the limited-benefit plans sold to Plaintiff through USHEALTH Advisors and its agents.

4. Defendant Ferst Choice Insurance LLC is a licensed insurance agency that, at all relevant times, transacted insurance business in Nevada and participated in the marketing and sale of the products at issue.

5. Ferst Choice Insurance LLC is liable to Plaintiff directly and under *respondeat superior*. Ferst Choice acted within the course and scope of its agency relationship with USHEALTH Advisors and Freedom Life and participated jointly in the deceptive marketing, lead-generation, and sales practices described herein. Ferst Choice acted in concert with USHEALTH Advisors and Freedom Life and is jointly and severally liable for the resulting harm.

6. Defendant Connor Ferst is a licensed insurance producer who, at all relevant times, transacted insurance business in Nevada and personally marketed and sold the products at issue to Plaintiff.

7. Connor Ferst is liable to Plaintiff directly and under *respondeat superior*. Ferst acted within the course and scope of his agency with USHEALTH Advisors and Freedom Life and participated jointly in the deceptive lead-generation, misrepresentations, and sale of limited-benefit plans described herein. Ferst acted in concert with USHEALTH Advisors and Freedom Life and is jointly and severally liable for the resulting harm.

8. Plaintiff does not know the true names or capacities of the defendants sued herein as DOES I through X; therefore, Plaintiff sues defendants by such fictitious names and prays leave that when the true names of said defendants are ascertained, they may be inserted with appropriate allegations. Plaintiff is informed and believes, and upon such information and belief, allege that each of the defendants designated herein by such fictitious names is responsible in

some manner for the events and happenings hereinafter referred to and that such conduct of defendants caused injury and damages proximately thereby to Plaintiff. Upon learning the true names and identities of DOES I through X, Plaintiff will seek leave of court to amend this Complaint.

9. Plaintiff does not know the true names or capacities of the defendants sued herein as ABC CORPORATIONS A-Z; therefore, Plaintiff sues said defendants by such fictitious names and prays leave that when the true names of said defendants are ascertained, they may be inserted with appropriate allegations. Plaintiff is informed and believes, and upon such information and belief, alleges that each of the defendants designated herein by such fictitious names is responsible in some manner for the events and happenings hereinafter referred to and that such conduct of defendants caused injury and damages proximately thereby to plaintiffs. Upon learning the true names and identities of ABC CORPORATIONS A-Z, Plaintiff will seek leave of court to amend this Complaint.

10. At all times relevant herein, Defendants, and each of them, were the agents and employees of each of the remaining defendants and/or acting in concert with one another and were at all times acting within the course and scope of said agency and employment, and each defendant has ratified and approved the acts of the other. Therefore, each defendant is liable for the acts of each remaining defendant.

11. That the conduct of each and every defendant was ratified and adopted by each and every other defendant in this action.

12. The corporate defendants, and each of them, were acting by and through their authorized employees, agents, and/or representatives, who were acting within the scope and course of said capacity, and whose conduct was ratified by each of said defendants.

13. The parties have caused the following events to occur in Clark County, Nevada, from which these claims arise.

## GENERAL ALLEGATIONS

14. Plaintiff Robert Kent Walls is a self-employed Nevada resident who, in February 2024, sought to obtain true major-medical PPO health-insurance coverage for himself and his family.

15. Prior to March 2024, the Walls family was insured under a major-medical PPO plan through Azusa Pacific University, with Blue Cross of California serving as the carrier. That comprehensive coverage remained in effect through February 2024, and Walls sought comparable coverage to replace it.

16. Defendants Connor Ferst and Ferst Choice Insurance LLC ("Ferst") marketed themselves to Nevada consumers as providers of "Affordable PPO Health Coverage with Low Deductibles & Great Benefits" through the website ferstchoiceinsurance.com. The website has since been altered, but at the time it represented that Ferst could provide PPO-based major-medical insurance plans.

17. The products marketed and sold to Walls were underwritten by Freedom Life Insurance Company of America, a subsidiary of USHEALTH Group, Inc., and consisted solely of limited-benefit fixed-indemnity plans and supplemental products—not comprehensive major-medical PPO insurance.

18. At all relevant times, Ferst was authorized to sell only these supplemental and limited-benefit products through USHEALTH Advisors, a captive national sales organization wholly owned by USHEALTH Group, Inc. USHEALTH Advisors exclusively markets insurance products underwritten by Freedom Life, Enterprise Life Insurance Company, and National Foundation Life Insurance Company.

19. USHEALTH Advisors conducts its sales operations through licensed 1099 independent contractors who act as appointed agents of Freedom Life and USHEALTH Advisors. Although classified as independent contractors for payroll purposes, these agents operate within a tightly controlled captive sales structure, use USHEALTH Advisors' marketing materials and scripts, sell only USHEALTH-underwritten products, and present themselves to consumers as authorized insurance professionals. Their conduct is attributable to USHEALTH Advisors and Freedom Life under principles of actual and apparent authority.

20. USHEALTH Group, Freedom Life, and USHEALTH Advisors market only supplemental and limited-benefit insurance products; they do not offer or underwrite any form of comprehensive major-medical PPO insurance. Because the companies he represented did not

offer major-medical coverage at all, Ferst had no ability or authority to provide Walls with true PPO major-medical insurance.

21. The captive sales structure materially contributed to the misleading nature of the transaction. Ferst presented the USHEALTH Group products as PPO-based major-medical coverage despite knowing that neither he nor USHEALTH Advisors was licensed, authorized, or able to sell actual major-medical PPO plans, and that the companies he represented did not offer such plans in the first place.

22. Upon information and belief, Ferst became aware of Walls's interest through an internet-based health-insurance lead generator—a public-facing solicitation tool designed to attract consumers searching for comprehensive health-insurance options, identify individuals seeking such coverage, and collect or transmit their personal information to insurance agents for sales follow-up, including agents not licensed to sell the products consumers believe they are requesting.

23. Upon information and belief, subject to confirmation through discovery, USHEALTH Advisors, Freedom Life, and USHEALTH Group promote their supplemental and limited-benefit plans and discount memberships through a network of lead-generation websites.

24. Upon information and belief, subject to confirmation through discovery, many consumers who submit their personal information to these websites do so under the belief that they will receive information about comprehensive health insurance options.

25. Upon information and belief, subject to confirmation through discovery, consumers typically locate these lead-generation websites by conducting online searches for health insurance. After submitting their information, consumers are contacted by USHEALTH Advisors' salespersons, or, alternatively, reach out themselves using toll-free numbers displayed on the companies' websites.

26. Upon information and belief, subject to confirmation through discovery, USHEALTH Advisors conducts both outbound and inbound sales calls and routinely represents its sales agents as licensed insurance professionals.

27. During these sales calls, USHEALTH Advisors' salespersons falsely claim that the plans provide coverage for preexisting medical conditions, prescription medications, hospitalization, laboratory services, and access to a broad network of primary-care physicians, specialists, and other healthcare providers for nominal copayments.

28. USHEALTH Advisors' salespersons frequently employ insurance terminology—including "premium," "PPO," "copay," "deductible," "coverage," and "preexisting condition"—despite these terms having no applicability to the limited-benefit plans and discount memberships they actually sell. Salespersons often assure consumers that the purported "PPO" plans are widely accepted by doctors nationwide, only for consumers to later discover that providers do not accept the plans or that any available discounts are negligible.

29. USHEALTH Advisors' salespersons further misrepresent that the plans are comparable to comprehensive health insurance but available at a lower cost and without deductibles. Once consumers express interest, USHEALTH Advisors' salespersons collect payment information and then transfer consumers to a separate employee for a so-called "verification" process.

30. Before initiating verification, USHEALTH Advisors' salespersons instruct consumers to disregard any statements in the verification script that contradict the sales pitch, thereby pressuring consumers to agree to lengthy, complex disclosures they do not understand and that directly conflict with the prior representations made during the sales call.

31. On February 14, 2024, Ferst coached Walls through the required USHEALTH Group verification call by instructing him to answer "NO" to every medical question, deny any medications, surgeries, or COVID-19 history, avoid providing additional information, refrain from asking questions, and keep the call "short & sweet." Ferst warned Walls that the verification representatives were "trying to find a reason to deny you," framing the process as adversarial and discouraging truthful disclosure.

32. Immediately after the verification call, Ferst texted Walls a form letter on USHEALTH letterhead that repeatedly referenced "PPO" and "PPO network access," instructed providers to apply PPO network discounts, and directed them to use PPO billing procedures. The letter was

formatted and worded in a manner that would lead a reasonable consumer or medical provider to believe the underlying product operated as a PPO major-medical plan.

33. The letter omitted that the underlying plan did not provide PPO benefits, did not involve contracted rates, and paid only fixed dollar amounts unrelated to provider charges. It further omitted that the plan lacked in-network protections, and all consumer safeguards associated with ACA-compliant major-medical insurance.

34. By emphasizing PPO processes while omitting material limitations, the letter created the misleading impression that the coverage functioned as a PPO major-medical plan. The use of PPO terminology, PPO billing instructions, and PPO network references is consistent with industry practices regulators have warned about, in which fixed-indemnity products are intentionally designed to resemble comprehensive insurance despite lacking its protections.

35. Ferst reinforced this deception by texting Walls a message referencing the USHEALTH letter and instructing him to “save this to show your doctors” so providers could “properly code each visit” and ensure Walls received “the max amount of benefits for every visit.” This instruction further conveyed that the plan operated like a PPO major-medical policy with contracted rates and claim-processing rules, when in fact the plan paid only minimal fixed-indemnity amounts regardless of provider coding or billed charges.

36. Ferst’s coaching was designed to ensure the sale proceeded while preventing Walls from learning that the product was not major-medical insurance. This conduct mirrors broader industry practices in which agents use verification calls not to clarify coverage, but to launder misrepresentations made during the sales pitch.

37. Ferst’s instructions directly contradict his later statements to regulators that he followed proper procedures and fully disclosed all material information. His conduct demonstrates knowledge, intent, and willful disregard for Walls’s rights and for the legal requirements governing insurance sales.

38. Upon information and belief, subject to confirmation through discovery, Ferst received sales commissions for the products sold to Walls, including the PremierAdvantage Fixed Indemnity PPO plan and associated ancillary coverages.

39. Upon information and belief, subject to confirmation through discovery, the commissions paid to Ferst for selling Freedom Life's limited-benefit and supplemental products were substantially higher than commissions typically paid for comprehensive or major-medical insurance, creating a financial incentive to steer consumers toward fixed-indemnity and supplemental products regardless of suitability.

40. Upon information and belief, subject to confirmation through discovery, Ferst's compensation structure rewarded both the volume and type of fixed-indemnity sales generated, encouraging aggressive or misleading sales tactics and contributing to the misrepresentations made to Walls regarding the nature, scope, and protections of the coverage he was purchasing.

41. During the initial sales call on February 13, 2024, Walls expressly stated that he required true PPO major-medical coverage for himself and his family. Walls made clear that he needed comprehensive insurance that provided in-network protections, contracted rates, and meaningful emergency-care coverage, consistent with the major-medical PPO plan his family previously carried.

42. At no point during that conversation did Ferst disclose that he did not sell major-medical PPO insurance or that he was contractually restricted to offering only limited-benefit fixed-indemnity and supplemental products through USHEALTH Advisors and USHEALTH Group. Instead, Ferst proceeded with the sales presentation as though he could satisfy Walls's stated need for major-medical PPO coverage, creating the false impression that the Freedom Life products he offered were PPO-based major-medical insurance when they were, in fact, limited-benefit indemnity plans lacking the protections, coverage, and network features Walls specifically requested.

43. Throughout the sales process—and even after enrollment—Ferst repeatedly represented, both verbally and in writing, that Walls was enrolled in a PPO health-insurance plan. Ferst further assured Walls that emergency treatment at Centennial Hills Hospital would be covered under the No Surprises Act, a federal protection that applies only to ACA-compliant major-medical plans and does not apply to fixed-indemnity or supplemental insurance products.

44. On or about May 14, 2024, Ferst sent Walls a mass-marketing solicitation in which he represented himself as "CEO of Ferst Choice Insurance" and a "Health Insurance Advisor," and promoted what he described as "Affordable PPO Health Coverage with Low Deductibles & Great Benefits." In the same communication, Ferst claimed he could save consumers "hundreds, if not thousands of dollars," asserted that medical expenses are the "#2 leading cause of bankruptcy in America," and encouraged Walls to refer friends and family in exchange for a $200 cash incentive per referral and additional cash prizes through a referral contest.

45. This communication demonstrates that Ferst—and, by extension, USHEALTH Advisors and Freedom Life—marketed the limited-benefit fixed-indemnity products as PPO-based major-medical insurance with low deductibles and broad benefits, despite knowing that neither Ferst nor USHEALTH Advisors was licensed, authorized, or able to sell comprehensive major-medical PPO coverage, and that the products offered no such protections.

46. The referral incentives, cash rewards, and contest structure further reflect the aggressive and misleading marketing practices used by USHEALTH Advisors and its agents to expand sales of limited-benefit products by inducing consumers to recommend the plans to others under the false belief that they constitute legitimate PPO health-insurance coverage.

47. At no point did Ferst disclose that the products he was selling were fixed-indemnity or supplemental insurance plans, nor did he explain that such products lack the protections, network benefits, and coverage features associated with major-medical insurance. Instead, Ferst continued to affirm—through multiple communications, including as late as July 2025—that Walls "does have a PPO plan," reinforcing the false impression that Walls had purchased comprehensive PPO major-medical coverage rather than a limited-benefit indemnity product.

48. In reality, the products sold to Walls were fixed-indemnity and supplemental insurance plans that provided none of the features of a PPO health-insurance policy. These products did not offer in-network or out-of-network benefits, did not include contracted rates with providers, and did not provide the protections, coverage levels, or consumer safeguards associated with major-medical insurance.

49. After issues arose with claim payments, Freedom Life confirmed that the plan was not ACA-compliant, was not major-medical insurance, and provided only a $250 annual emergency-room benefit, along with other minimal fixed-indemnity payments wholly inconsistent with the PPO coverage Walls had been promised.

50. Ferst never disclosed the limitations of the policy, never informed Walls that the product was not major-medical insurance, and repeatedly asserted that the plan provided in-network benefits, emergency-visit coverage, and PPO protections. These representations were inconsistent with the actual terms of the Freedom Life products and materially misled Walls regarding the nature and scope of the coverage he was purchasing.

51. Walls reasonably relied on Ferst's representations.

52. Upon information and belief, and subject to confirmation through discovery, the supplemental insurance products and complex fixed-indemnity plans sold in the individual market—including those sold to Walls—are intentionally structured around variable benefit schedules and purported provider networks that mimic the appearance of comprehensive or major-medical coverage. These plan designs mislead consumers about the nature and extent of the benefits, particularly when the products advertise "network participation" as a means of reducing out-of-pocket costs. In reality, fixed-indemnity and supplemental insurance products do not function like major-medical coverage and do not provide the consumer protections required under federal law.

53. Upon information and belief, and subject to confirmation through discovery, regulators have warned that hospital-indemnity and other fixed-indemnity insurance products are increasingly used by issuers, plan sponsors, agents, and brokers to circumvent federal consumer-protection requirements while marketing products that blur the line between fixed-benefit coverage and true major-medical insurance. These products no longer serve the traditional purpose of fixed-indemnity insurance—income or wage replacement—and instead imitate major-medical coverage without providing its protections, contributing to widespread consumer confusion and financial harm.

54. On or about February 15, 2024, Plaintiff asked Defendant Ferst via text whether he could cancel his existing health insurance effective March 1 and whether there was "no chance it falls through." Defendant Ferst responded, "You are all set! You can cancel your other insurance… You are in good hands with me I promise you," assuring Plaintiff that the new coverage was secure and sufficient.

55. On or about February 15, 2024, Walls purchased a PremierAdvantage Policy, a Five Year Term Renewable to Age 70 Life Insurance Policy with Term Life for Dependents and Critical Illness Accelerated Benefit (a.k.a. MedGuard III Policy), an Accident Policy (a.k.a. Accident Protector Policy), a Vision Insurance Policy (a.k.a. PremierVision Policy), and a Dental Insurance Policy (a.k.a. SecureDental Plus Policy).

56. On March 1, 2024, the Policy was issued and became effective. The Policy, numbered 52Z211914F and issued under Policy Form FIPC 2021 IP NV FLIC, covered Plaintiff Robert Kent Walls, his wife Ashley C. Walls, and their daughters, Paisley A. Walls and Matelyn M. Walls. The Policy documents included policy schedules and a schedule of operations assigning fixed dollar amounts to specific medical services. Although the Policy stated that insureds may obtain covered medical, surgical, and prescription services from any provider or pharmacy they choose, it further warned that using non-participating providers or pharmacies would result in significantly higher out-of-pocket costs than using participating, in-network options. This language reinforced the false impression that the Policy operated as a PPO major-medical plan with contracted rates and network protections, when in reality the Policy paid only minimal fixed-indemnity amounts regardless of provider participation or billed charges.

57. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the nature of their products by marketing supplemental and fixed-indemnity plans alongside PPO network branding, knowing that consumers will reasonably—but incorrectly—believe that "in-network" status provides contracted-rate protections, reduced costs, or other features associated with major-medical PPO insurance. This marketing strategy exploits consumer familiarity with PPO terminology and is designed to create the false impression that the products function like comprehensive

health-insurance plans, despite providing only limited fixed-dollar benefits and lacking all major-medical protections.

58. On or about March 3, 2024, Walls texted Ferst three screenshots showing that Carenow Urgent Care Center was listed as an in-network specialty urgent care facility and that Wall's wife, Ashley Walls, was marked as an "Ineligible" member. Walls informed Ferst that urgent care staff were stating the insurance was not active despite Walls having online access to the account, valid insurance cards, and confirming the facility was in-network. Walls reported that they were required to pay $180.00 out-of-pocket because the system showed them as uninsured and requested assistance.

59. Ferst instructed Walls not to pay anything; when Walls responded that payment had already been made, Ferst assured Walls that the issue was resolved and that reimbursement would be provided.

60. On or about March 6, 2024, Walls received a text message from Ferst providing an "update on the claim" and stating that Freedom Life required either an itemized urgent care bill or an HCFA/UB92 claim form obtainable from the provider. Walls responded by sending Ferst screenshots containing the requested information.

61. On or about March 12, 2024, Ferst informed Walls via text that the reimbursement request had been processed and that he had submitted the necessary documentation.

62. After Walls enrolled in the PremierAdvantage plan, Ferst represented that he had checked the UnitedHealthcare ("UHC") Choice Plus PPO provider directory and confirmed that Centennial Hills Hospital—Walls's preferred hospital—was "in network."

63. Walls relied on this post-enrollment representation, along with the in-network listing on the UnitedHealthcare ("UHC") Choice Plus PPO provider directory, in maintaining the coverage and in seeking medical treatment at Centennial Hills Hospital.

64. Between March 2024 and December 2024, Walls and his family incurred multiple emergency room visits at Centennial Hills Hospital, which Ferst, and UnitedHealthcare represented—both through the UHC Choice Plus directory and the provider portal—to be an in-network facility.

65. On or about July 3, 2024, Plaintiff texted Ferst seeking clarification regarding the nature of his health insurance coverage. Plaintiff explained that he had been unable to locate any clear or basic explanation of his policy on the Freedom Life or USHEALTH Group websites and reported that his wife had recently visited the emergency room for a knee injury, resulting in charges exceeding $2,000.00 plus a separate bill from the radiology provider, for which the insurance paid only $100.00. Plaintiff stated that it appeared he may have misunderstood the plan because it did not cover the basic services he expected and asked Defendant Ferst for any resource, summary, or one-page explanation that would clarify the coverage.

66. Plaintiff received no response to this message.

67. Centennial Hills Hospital submitted four claims between June and December 2024 for emergency-related services provided to Plaintiff's wife and daughters—Claim Nos. 241845562S ($5,196.00), 2425475896 ($3,091.00), 243625334S ($4,713.00), and 250077804S ($3,363.00). In each instance, the hospital was identified as a UHC Choice Plus in-network provider but billed charges below the contracted rate, eliminating any network discount. The plan issued only minimal fixed-benefit payments ($250.00–$280.00 for emergency room or laboratory services), denied certain outpatient pharmacy charges as non-covered, and assigned the remaining balances—ranging from $2,841.00 to $4,895.00—to patient responsibility on the ground that maximum benefits had been exhausted.

68. The denials included $4,895.00, $2,841.00, $4,433.00, and $3,333.00 in uncovered charges, generating substantially higher billed amounts than would have been incurred had the promised in-network coverage been provided.

69. In each of the four claims, Freedom Life applied no PPO discount, paid only minimal fixed-indemnity amounts, and shifted the remaining balances—totaling several thousand dollars per claim—to Walls as patient responsibility. The hospital therefore initially billed Walls for the full undiscounted charges. To mitigate the financial harm caused by Defendants' misrepresentations, Walls spent months disputing the balances, contacting billing departments, submitting documentation, and ultimately escalating the matter to hospital leadership. Only after these sustained efforts were the charges reduced to a final out-of-pocket liability of $6,100.80.

This prolonged administrative burden, financial exposure, and emotional distress were the direct and foreseeable result of Defendants' false assurances that Walls had PPO major-medical coverage with contracted rates and emergency-care protections.

70. Upon information and belief, and subject to confirmation through discovery, consumers who mistakenly purchase these products in place of major-medical coverage are left without the critical safeguards that comprehensive insurance is required to provide. Without contracted rates, out-of-pocket maximums, emergency-care protections, or the federal consumer rights afforded under the Affordable Care Act, such consumers face substantial and unexpected financial liability when seeking necessary medical treatment. These harms are consistent with regulatory findings that fixed-indemnity products marketed as PPO-style plans expose consumers to significant medical debt and coverage gaps.

71. Walls's experience exemplifies this harm and reflects the predictable consequences of Defendants' deceptive marketing and sales practices.

72. On or about May 24, 2025, Plaintiff texted Ferst seeking clarification and asked, "Is this true about my health insurance?" and attached a screenshot titled "Your Insurance Plan: What you actually have." The screenshot stated that Plaintiff was covered under a "Fixed Indemnity Plan" from Freedom Life Insurance Company of America, under USHEALTH Group, which is affiliated with UnitedHealthcare, and further stated that the plan "uses the UnitedHealthcare PPO network, but this is not major medical…PPO Plan."

73. Plaintiff received no response to this inquiry.

74. On or about May 27, 2025, Walls received a text message from Ferst stating, "Good morning, I am actively working on submitting these claims etc for you. I will get back to you asap today to talk more about what is going on here."

75. Ferst further asserted that "Centennial hospital changed their policy with United and took our emergency medicine benefits. I am fighting tooth and nail with them over this."

76. Walls then asked whether his plan included a maximum out-of-pocket amount, explaining that he had attempted to locate this information but the insurer's website was unclear.

77. Ferst responded, "Yes, you do. I will send over a copy of where it says that in [the] brochure."

78. As of June 3, 2025, Walls had not received the brochure Ferst previously promised to provide.

79. On or about June 3, 2025, Walls again requested a copy of the brochure explaining the plan's maximum out-of-pocket provisions.

80. Ferst responded that he had emailed the document to Walls.

81. Walls then sent Ferst a screenshot of his email inbox demonstrating that no such email had been received. Walls subsequently asked Ferst whether he needed "a different plan that would be more family friendly."

82. On or about June 10, 2025, Walls texted Ferst requesting an update on the status of the claims. Ferst responded that he would "call in again," that he had "yet to get any updates," and that the last information he received was that processing would take "35–41 business days."

83. On or about June 20, 2025, Walls texted Ferst stating, "I just got another bill saying I owe full payment for all of these. Did they deny it?" Ferst asked whether the bill was from the hospital or from the online portal, and Walls confirmed it was a hospital bill.

84. Ferst responded that the hospital would "send you stuff," instructed Plaintiff not to pay the bill, and stated he would check the status of the claim. Defendant Ferst further commented that "all [the hospitals] care about is collecting their…check".

85. On or about July 2, 2025, Walls texted Ferst requesting an update on the status of the claims.

86. Plaintiff received no response.

87. On or about July 8, 2025, Walls texted Ferst a screenshot of a Freedom Life Insurance Company of America Explanation of Benefits (EOB) that the total payment on his wife's claim was approximately $100.00 and asked, "$100? That's it." Later that same day, Walls texted Ferst again, stating that he now owed approximately $16,000.00 in medical bills arising from the four claims at issue.

88. On or about July 10, 2025, Walls texted Ferst multiple screenshots of Freedom Life's EOBs and requested "insight," noting that none of the charges appeared to be covered. Defendant Ferst responded that he would "call first thing in the morning" and that he was "waiting for [the] claims to be processed still through insurance." He further stated, "I am saying there are more things to be processed, it looks like they just took care of one accident." Plaintiff replied that he needed an update in the morning and expressed concern that the claim Ferst referenced had the same settlement date as the others. Plaintiff also stated that the PPO plan Ferst originally described and sold to him did not involve owing $15,000–$16,000 in medical bills for basic family needs.

89. On or about July 11, 2025, Defendant Ferst texted Plaintiff stating, "844 451 7868, been on the phone with them all morning, I got Ashley's entire accident covered. As far as the remaining balances, they will not talk to me about it and said you have to call the number above to take care of the rest and upgrade your plan and use the max out of pocket. The biggest thing is Centennial hospital never mentioned to you that they were out of network, which by law you have the right to deny all bills. I am sorry this has happened I promise I have done everything I could. **You do have a PPO plan** (emphasis added)."

90. Walls asked for clarification, stating, "I upgrade my plan and then retroactively they cover it? Thanks for confirming I have a PPO plan."

91. After investigating the so-called "upgrade" option, Walls determined that it provided no meaningful benefit. The option applied to only a single claim, required a $900 fee and a $3,000 deductible, and—at best—would have covered approximately $2,000 of one outstanding charge, and only if approved. Walls would remain responsible for the balance of all other charges.

92. On or about July 12, 2025, Walls texted Ferst seeking clarification regarding the application of the PPO network to recent medical services for his daughters. Walls explained that he had been reviewing the EOBs and coverage breakdowns and asked how the PPO network applied, noting that although Centennial Hills Hospital Medical Center was listed as in-network, none of the related bills had been covered.

93. Ferst responded by asking whether Walls had listened to his voicemail. Plaintiff confirmed that he had and that the voicemail suggested contacting the hospital to discuss a "No Surprise Bill."

94. Walls then reiterated his request for clarification, asking whether the hospital should be covering or waiving the bills given its in-network status and whether doing so required him to provide specific documentation. Walls further asked whether the hospital visits should be waived under the No Surprises Act because Centennial Hills Hospital Medical Center was considered in-network under the PPO. Defendant Ferst responded, "Correct sir!"

95. Throughout 2024 and 2025, Walls repeatedly contacted Ferst seeking clarification about why the plan was not functioning like a PPO. Ferst repeatedly reassured him that claims were still processing, that the hospital was in network, and that the No Surprises Act required the hospital to waive the bills. These assurances were inconsistent with the actual terms of the policy and served to delay Walls's discovery that he had been sold a fixed-indemnity product rather than PPO major-medical coverage.

96. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by allowing agents to invoke the No Surprises Act in marketing and customer-service communications, despite knowing the Act does not apply to supplemental fixed-indemnity products. Such statements mislead consumers into believing they have federally protected emergency-care coverage and discourage them from questioning unexpected medical bills or coverage denials.

97. Walls did not receive the policy brochure until June 3, 2025—more than one year after enrollment—and only after repeatedly requesting it. Prior to that, Ferst merely flashed portions of the brochure during a rapid screenshare presentation immediately before proceeding to enrollment, preventing Walls from meaningfully reviewing or understanding the product's limitations.

98. Walls neither received nor confirmed receipt of the policy brochure before purchase. He was therefore unable to review the disclosures that Defendants later claimed were provided to him.

99. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by relying on minimal, obscure, or post-sale disclosures while permitting agents to provide contradictory verbal assurances. Defendants know that consumers reasonably rely on the agent's statements rather than buried written materials, and they structure their sales process to exploit that reliance while maintaining superficial documentation to shield themselves from accountability.

100. On or about October 28, 2025, in response to Walls's Complaint to the Nevada Division of Insurance, Freedom Life submitted a written statement denying any wrongdoing and asserting that Walls was fully informed of the fixed-indemnity nature of the coverage. Freedom Life further claimed that PPO network access under the plan was meaningful, that all claims were processed correctly, that Walls received all policy documents, and that his complaints were "unsupportable."

101. These assertions are contradicted by the contemporaneous record, including Ferst's written statements confirming PPO coverage, confirming that Centennial Hills Hospital was "in network," and instructing Walls to answer "NO" to all underwriting questions. These materials demonstrate that Defendants repeatedly represented the product as PPO major-medical coverage and actively concealed its fixed-indemnity nature.

102. Freedom Life's own settlement offer of $17,466.75—nearly the full amount of Walls's out-of-pocket losses—further contradicts its claim that Walls's complaints were baseless. A company does not offer nearly $18,000 to resolve a matter in which it believes there is "no evidence of misrepresentation." The offer is consistent with Defendants' awareness that the policy was sold through deceptive representations and that Walls suffered substantial financial harm as a result.

103. Walls paid $21,290.40 in premiums and was billed $15,149.00 in uncovered medical charges. After months of disputes and escalations, he was able to reduce the balances to a final out-of-pocket liability of $6,100.80, resulting in a total financial loss of $27,391.20. Freedom Life paid approximately $860.00 on all claims, leaving Walls to absorb virtually the entire financial burden. These losses were the direct and foreseeable result of Defendants'

misrepresentations that the product was PPO major-medical coverage with contracted rates and emergency-care protections, when in fact it was a limited fixed-indemnity plan that provided almost no meaningful coverage.

104. Upon information and belief, USHEALTH Advisors and Freedom Life engage in misleading practices designed to increase profits at the expense of their insureds, to whom they owe fiduciary-like duties. Rather than clearly disclosing the true scope and limitations of the coverage being sold, USHEALTH Advisors and Freedom Life benefit when consumers mistakenly believe they have major-medical protection and only discover significant coverage gaps after incurring substantial medical expenses. This business model relies on consumer confusion, agent-driven misrepresentations, and the strategic use of PPO-style branding to mask the limited nature of the underlying fixed-indemnity products.

105. USHEALTH Advisors, Freedom Life, and Conner Ferst failed and refused to provide Walls with the explanations necessary for him to understand what was and was not covered under the policy. Despite repeated inquiries, Walls was never given a clear, accurate, or timely explanation of the fixed-indemnity structure, the absence of PPO benefits, or the extremely limited emergency-room coverage. Instead, Ferst repeatedly reassured Walls that the plan operated as PPO coverage, further obscuring the true nature of the policy and preventing Walls from discovering the coverage gaps until after he incurred substantial medical expenses.

106. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the nature of their products by failing to correct known sources of consumer confusion and by failing to direct consumers to accurate resources explaining the differences between major-medical coverage and fixed-indemnity or supplemental excepted-benefits coverage. USHEALTH Advisors and Freedom Life are aware that consumers frequently misunderstand fixed-indemnity and supplemental products as substitutes for comprehensive insurance, yet they do not take adequate steps to dispel these misconceptions or ensure that consumers understand the limitations of the coverage being sold.

107. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts through abusive and misleading

marketing tactics designed to make fixed-indemnity and supplemental products appear similar to major-medical coverage. These tactics include the use of PPO branding, references to network participation, and marketing materials that mimic the appearance and structure of comprehensive insurance, all of which contribute to consumer confusion and lead purchasers to believe they are obtaining true major-medical protection when they are not.

108. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by selling fixed-indemnity and supplemental coverage to consumers who mistakenly believe these products are subject to the federal consumer protections that apply to major-medical health insurance. As a result, consumers are exposed to significant financial and health risks that only become apparent during costly medical events, when it is too late to obtain meaningful or comprehensive coverage.

109. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by engaging in marketing practices that states have the authority to regulate and discipline, including the sale of fixed-indemnity and supplemental coverage as a replacement for major-medical insurance. These practices undermine state regulatory frameworks, circumvent consumer-protection standards, and deprive consumers of the protections they reasonably expect when purchasing what they believe to be legitimate health-insurance coverage.

110. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by designing and marketing complex fixed-indemnity and supplemental policies with variable benefit schedules and purported provider networks that mimic the structure and appearance of major-medical coverage. These plan designs create the false impression of PPO participation, contracted-rate protections, and meaningful in-network benefits, even though no such protections exist and the products function solely as limited-benefit indemnity coverage.

111. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by relying solely on minimal notice in application materials, despite knowing that such disclosures are insufficient for

consumers with low health-insurance literacy. They are aware that consumers frequently depend on verbal explanations from agents—particularly when evaluating fixed-indemnity and supplemental products—yet they continue to permit agents to provide misleading assurances that contradict the written materials. This practice allows consumers to be steered into limited-benefit products under the false impression that they function like major-medical coverage.

112. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by structuring their compensation model to prioritize high commissions—sometimes up to ten times higher than commissions for major-medical plans—which incentivizes aggressive or deceptive sales tactics. This compensation structure encourages agents to steer consumers toward fixed-indemnity and supplemental products regardless of suitability, consumer understanding, or the substantial limitations of these products when compared to comprehensive major-medical coverage.

113. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by selling fixed-indemnity and supplemental products that expose consumers to substantial financial risk when used as a substitute for major-medical coverage. These risks include high out-of-pocket expenses, medical debt, surprise out-of-network bills, and the possibility of medical bankruptcy—foreseeable consequences of a product design that provides only limited, schedule-based payments rather than comprehensive insurance protections.

114. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by using lead-generation websites that direct consumers to brokers who market fixed-indemnity and supplemental products in a manner designed to resemble major-medical coverage. These lead-generation funnels target individuals actively seeking comprehensive health insurance and divert them into purchasing limited-benefit products that do not meet their medical needs or provide the protections they reasonably expect.

115. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by invoking the No Surprises

Act in marketing communications, despite knowing that the Act does not apply to fixed-indemnity or supplemental excepted-benefits products. This practice misleads consumers into believing they have federally protected emergency-care coverage and balance-billing protections when, in fact, these limited-benefit products provide no such safeguards.

116. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by targeting consumers with low health-insurance literacy, knowing they are more likely to be misled into believing that fixed-indemnity and supplemental products will reduce out-of-pocket costs while functioning like major-medical insurance. USHEALTH Advisors and Freedom Life exploit this vulnerability to increase sales of limited-benefit products, despite knowing that such products are not suitable substitutes for comprehensive health-insurance coverage.

117. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by prioritizing their own financial interests—selling more fixed-indemnity and supplemental policies and paying disproportionately high commissions to agents—over consumer protection, despite knowing that these products fall squarely within the ordinary consumer understanding of "health insurance." USHEALTH Advisors and Freedom Life benefit when consumers misunderstand the limited nature of the coverage, and they have taken no meaningful steps to correct this misunderstanding or ensure that consumers are informed that these products are not substitutes for major-medical insurance.

118. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by invoking the No Surprises Act in marketing communications, despite knowing that the Act does not apply to fixed-indemnity or supplemental excepted-benefits products. This practice misleads consumers into believing they have federally protected emergency-care coverage and balance-billing protections when, in fact, these limited-benefit products provide no such safeguards.

119. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by targeting consumers with low

health-insurance literacy, knowing they are more likely to be misled into believing that fixed-indemnity and supplemental products will reduce out-of-pocket costs while functioning like major-medical insurance. USHEALTH Advisors and Freedom Life exploit this vulnerability to increase sales of limited-benefit products, despite knowing that such products are not suitable substitutes for comprehensive health-insurance coverage.

120. Upon information and belief, and subject to confirmation through discovery, USHEALTH Advisors and Freedom Life misrepresent the facts by prioritizing their own financial interests—selling more fixed-indemnity and supplemental policies and paying disproportionately high commissions to agents—over consumer protection, despite knowing that these products fall squarely within the ordinary consumer understanding of "health insurance." USHEALTH Advisors and Freedom Life benefit when consumers misunderstand the limited nature of the coverage, and they have taken no meaningful steps to correct this misunderstanding or ensure that consumers are informed that these products are not substitutes for major-medical insurance.

121. The foregoing conduct constitutes a continuous and systemic pattern of deceptive, misleading, and unlawful practices carried out by Defendants in connection with the marketing, sale, and administration of health-insurance-related products. As detailed above, Defendants knowingly misrepresented the nature, scope, and protections of the coverage sold to Plaintiff; concealed material limitations; exploited consumer confusion; and engaged in a sales and verification process designed to obscure the true character of the supplemental and fixed-indemnity products they offered.

122. As a direct and foreseeable result of these misrepresentations and omissions, Plaintiff suffered substantial financial harm, incurred significant uncovered medical expenses, and was deprived of the comprehensive PPO major-medical coverage he reasonably believed he had purchased.

**FIRST CAUSE OF ACTION**

**Intentional Misrepresentation**

***(Against all Defendants)***

123. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

124. Defendants USHEALTH Advisors, Freedom Life, Ferst Choice Insurance LLC, and Connor Ferst owed Plaintiff a duty not to make false, misleading, or deceptive statements of material fact in connection with the marketing and sale of insurance. This duty included accurately describing the nature of the coverage, the scope of benefits, the existence or absence of PPO networks, and the applicability of federal protections such as the No Surprises Act.

125. Defendants further owed Plaintiff a duty to disclose all material facts relating to the nature, scope, limitations, and adequacy of the insurance product being sold, including the fixed-indemnity nature of the plan, the absence of contracted rates, the lack of PPO coverage, the limited emergency-room benefit, and the inapplicability of the No Surprises Act.

126. Acting within the course and scope of his agency with USHEALTH Advisors and Freedom Life, Ferst intentionally represented to Plaintiff that the policy being sold was major-medical insurance, that it was a PPO plan, that it provided in-network access through the UnitedHealthcare Choice Plus PPO network, and that emergency medical treatment would be covered and protected under the No Surprises Act. After enrollment, Ferst further confirmed that Centennial Hills Hospital was "in network" by referencing the UHC PPO provider directory and represented that PPO discounts and protections would apply. Each of these representations was a material fact.

127. These representations were false. The policy sold to Plaintiff was a fixed-indemnity plan, not a PPO, not major-medical coverage, not ACA-compliant, and not subject to the No Surprises Act. Freedom Life later admitted that the plan provided only limited fixed-dollar benefits, including a $250 emergency-room benefit, and that none of the PPO-related representations made by Ferst were accurate.

128. Defendants knew their representations were false at the time they were made, or made them recklessly and without regard for their truth, including representations concerning PPO coverage, major-medical status, emergency-care protections, and the applicability of the No Surprises Act.

129. Defendants intentionally failed to disclose these material facts and intentionally concealed the true nature and limitations of the policy, including its lack of PPO benefits, its lack of contracted rates, its lack of major-medical coverage, and its inability to provide meaningful protection for emergency medical care. Defendants further concealed that Plaintiff never received the brochure or policy documents prior to enrollment, despite later claiming otherwise.

130. Ferst continued to affirm these false representations both before and after enrollment, repeatedly confirming PPO coverage, in-network benefits, and emergency protections, despite knowing or recklessly disregarding that such statements were untrue. Ferst later admitted that he did not understand that the No Surprises Act did not apply, did not understand that fixed-indemnity plans do not provide PPO coverage, and did not know that Centennial Hills Hospital's emergency services were not covered. He further admitted that he would have "steered Plaintiff away" from the product had he known the truth.

131. The statements made by Defendants were specific, factual representations concerning the nature and scope of the coverage, not generalized opinions or non-actionable sales talk. A reasonable consumer evaluating health-insurance options would rely on such representations when determining whether a policy provides major-medical PPO coverage and federally protected emergency-care benefits.

132. Defendants made these misrepresentations with the intent that Plaintiff rely on them in deciding to purchase the policy and continue paying premiums. Defendants intended that Plaintiff believe he was receiving major-medical PPO coverage and intended that Plaintiff rely on their statements rather than seek alternative coverage.

133. Plaintiff reasonably and justifiably relied on Defendants' false representations and omissions in deciding to purchase the policy, in paying premiums totaling $21,290.40, and in foregoing the opportunity to obtain actual major-medical PPO coverage for his family. Plaintiff

had no reason to suspect that a licensed insurance agent and his carrier were providing inaccurate or incomplete information, and Plaintiff relied on those representations in good faith.

134. Defendants' misrepresentations and omissions were a substantial factor in causing Plaintiff's damages.

135. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered special and general damages, including but not limited to uncovered medical expenses, consequential financial losses, emotional distress, and attorneys' fees and costs incurred to obtain benefits wrongfully withheld.

136. Plaintiff is informed and believes, and alleges, that Defendants' conduct was not isolated. Defendants have engaged in similar misrepresentations and omissions with other consumers, reflecting a pattern and practice of deceptive sales practices designed to mislead consumers regarding the nature and limitations of Defendants' insurance products.

137. Defendants USHEALTH Advisors, Freedom Life, and Ferst acted fraudulently, oppressively, and in malicious disregard for the rights of Plaintiff. Their conduct included knowingly misrepresenting the nature of the coverage, concealing material facts, denying claims based on false rationales, attempting to shift blame to Plaintiff, and offering a substantial settlement despite asserting no wrongdoing. Plaintiff therefore seeks punitive damages by way of punishment and deterrence in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**Negligent Misrepresentation**

***(Against all Defendants)***

138. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

139. In the course of selling insurance to Plaintiff, Defendants USHEALTH Advisors, Freedom Life, Ferst Choice Insurance LLC, and Connor Ferst supplied information in connection with their business and for their pecuniary benefit. Defendants provided this information for the purpose of guiding Plaintiff in selecting and purchasing health-insurance coverage for himself and his family.

140. Defendants represented to Plaintiff that the policy being sold was major-medical insurance, that it was a PPO plan, that it provided in-network access through the UnitedHealthcare Choice Plus PPO network, and that emergency medical treatment would be covered and protected under the No Surprises Act. After enrollment, Ferst further represented that Centennial Hills Hospital was in network and purported to confirm this by referencing the UHC PPO provider directory, even though fixed-indemnity plans do not have networks, contracted rates, or PPO protections. Each of these representations was false.

141. Defendants supplied this information without exercising reasonable care or competence in obtaining or communicating it. In truth, the policy sold to Plaintiff was a fixed-indemnity plan, not a PPO, not major-medical coverage, not ACA-compliant, and not subject to the No Surprises Act. Freedom Life later admitted these facts, and Ferst admitted that he did not know the No Surprises Act did not apply, did not understand that fixed-indemnity plans do not provide PPO coverage, and did not know that Centennial Hills Hospital's emergency services were not covered.

142. Defendants further failed to disclose material facts that a reasonably careful insurance producer would have disclosed, including the severe limitations of the policy, the absence of PPO benefits, the lack of contracted rates, the limited $250 emergency-room benefit, and the inability of the policy to provide meaningful protection for emergency medical care. Defendants also failed to disclose that Plaintiff never received the brochure or policy documents prior to enrollment, despite later claiming otherwise.

143. Plaintiff expressly informed Ferst that he required a PPO major-medical policy for himself, his wife, and his two young children, and that he needed in-network access to Centennial Hills Hospital and meaningful emergency protections. Despite this clear instruction, Defendants negligently failed to procure adequate insurance and negligently misrepresented the nature and adequacy of the policy being sold. Ferst later admitted that, had he known the product's true limitations, he could have "steered [Plaintiff] away," underscoring that he did not understand the product he was selling and failed to exercise reasonable care.

144. Plaintiff reasonably and justifiably relied on Defendants' representations and omissions in deciding to purchase the policy, in paying premiums totaling $21,290.40, and in foregoing the opportunity to obtain actual major-medical PPO coverage. Plaintiff had no reason to suspect that a licensed insurance agent and his carrier were providing inaccurate or incomplete information, and Plaintiff relied on those representations in good faith.

145. Defendants' negligent misrepresentations and omissions were a substantial factor in causing Plaintiff's damages.

146. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff suffered damages, including but not limited to uncovered medical expenses, consequential financial losses, emotional distress, and attorneys' fees and costs incurred to obtain benefits wrongfully withheld.

**THIRD CAUSE OF ACTION**

**Negligent Hiring, Retention and Supervision**

***(Against USHEALTH Advisors and Freedom Life Insurance Company of America)***

147. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

148. USHEALTH Advisors and Freedom Life owed Plaintiff a duty to use reasonable care in the hiring, training, supervision, and retention of their insurance agents, including Defendants Ferst Choice Insurance LLC and Connor Ferst. This duty required USHEALTH Advisors and Freedom Life to ensure that their agents were properly trained, competent, and capable of truthfully and accurately representing the nature, scope, and limitations of USHEALTH Group's insurance products. This included ensuring that agents understood the differences between fixed-indemnity plans, supplemental excepted-benefits products, and major-medical PPO coverage, the applicability of federal protections such as the No Surprises Act, and the inherent limitations of USHEALTH Group's limited-benefit products.

149. Acting within the course and scope of his agency, Ferst represented to Plaintiff that the policy being sold was major-medical insurance, that it was a PPO plan, that it provided in-network access through the UnitedHealthcare Choice Plus PPO network, and that emergency

medical treatment would be covered and protected under the No Surprises Act. After enrollment, Ferst further represented that Centennial Hills Hospital was in network and purported to confirm this by referencing the UHC PPO provider directory—even though fixed-indemnity plans do not have networks, contracted rates, or PPO benefits.

150. These representations were false, misleading, and contrary to basic insurance principles. The policy sold to Plaintiff was a fixed-indemnity plan, not a PPO, not major-medical coverage, not ACA-compliant, and not subject to the No Surprises Act. Freedom Life later admitted these facts. Ferst himself admitted that he did not know the No Surprises Act did not apply, did not understand that fixed-indemnity plans do not provide PPO coverage, and did not know that Centennial Hills Hospital's emergency services were not covered.

151. USHEALTH Advisors and Freedom Life failed to use reasonable care in training, supervising, and retaining Ferst. USHEALTH Advisors and Freedom Life either failed to train Ferst at all or trained him in a manner that encouraged or permitted misrepresentations about PPO access, emergency coverage, and the applicability of federal protections.

152. USHEALTH Advisors and Freedom Life failed to ensure that Ferst understood the distinctions between fixed indemnity plans and major medical PPO coverage, the limitations of Freedom Life's products, the legal requirements governing emergency medical coverage, and the inapplicability of the No Surprises Act. They also failed to ensure that Ferst understood that fixed indemnity plans do not provide contracted rates, do not provide network benefits, and do not provide meaningful emergency-care protections, resulting in consumers being misled about the nature and adequacy of the coverage.

153. USHEALTH Advisors and Freedom Life knew or reasonably should have known that Ferst was inadequately trained, unqualified, or likely to misrepresent the nature of USHEALTH Group's insurance products. Freedom Life's own correspondence demonstrates that its "trained" agents routinely rely on PPO directories, misstate the applicability of the No Surprises Act, and misunderstand or misrepresent the limitations of fixed indemnity plans. These systemic issues show that Freedom Life either knowingly allowed its agents to make deceptive statements or failed to implement any meaningful training or supervision to prevent such misconduct. Despite

clear warning signs, Freedom Life failed to take reasonable steps to prevent foreseeable harm to consumers, including Plaintiff.

154. As a direct and proximate result of USHEALTH Advisors and Freedom Life's negligent hiring, training, supervision, and retention of Ferst, Plaintiff suffered special and general damages, including, but not limited to, consequential damages, emotional distress, and attorneys' fees.

**FOURTH CAUSE OF ACTION**

**Negligence**

***(Against all Defendants)***

155. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

156. Defendants USHEALTH Advisors, LLC, Freedom Life Insurance Company of America, Ferst Choice Insurance LLC, and Connor Ferst owed Plaintiff a duty to act with reasonable care, skill, and diligence as licensed insurance producers and brokers. This duty included accurately advising Plaintiff regarding available insurance options, understanding the products being sold, and ensuring that any representations made to Plaintiff were truthful, complete, and consistent with the actual coverage being offered.

157. USHEALTH Advisors and Freedom Life, through their agents and representatives, had been providing insurance services to consumers for years and held themselves out as knowledgeable and competent in advising consumers regarding health-insurance options. By marketing themselves as experts in health coverage and by soliciting Plaintiff's business, USHEALTH Advisors and Freedom Life assumed a duty to exercise reasonable care in evaluating Plaintiff's needs and recommending appropriate coverage.

158. By soliciting Plaintiff's business and holding themselves out as skilled insurance advisors, Defendants undertook a duty to exercise reasonable care in evaluating Plaintiff's needs and advising him regarding appropriate insurance coverage. Plaintiff expressly informed Ferst that he required major-medical PPO coverage for himself, his wife, and his two young children, and Defendants undertook to provide guidance consistent with that need.

159. Defendants breached their duty of reasonable care by negligently failing to procure adequate health insurance for Plaintiff and his family, despite Plaintiff's clear request for major-medical PPO coverage. Instead, Defendants sold Plaintiff a fixed-indemnity plan that did not provide PPO benefits, did not provide contracted rates, did not provide major-medical coverage, and did not provide meaningful emergency-medical protection. Ferst admitted that he relied on the UHC PPO directory, believed the plan provided network discounts, believed the No Surprises Act applied, and did not understand the limitations of the product he was selling.

160. Plaintiff is informed and believes, and alleges, that USHEALTH Advisors and Freedom Life failed to adequately train, supervise, and oversee their insurance producers, including Ferst, resulting in agents who were unqualified, uninformed, or incapable of accurately representing the nature and limitations of USHEALTH Group's insurance products. Freedom Life's own correspondence demonstrates that its agents routinely misunderstand the applicability of the No Surprises Act, the limitations of fixed-indemnity plans, and the absence of PPO benefits, and that Freedom Life failed to correct these deficiencies.

161. As a direct and proximate result of Defendants' negligence, Plaintiff was sold a fixed-indemnity plan that did not provide PPO benefits, did not provide major-medical coverage, did not comply with the Affordable Care Act, and did not provide meaningful emergency-medical protection. Plaintiff reasonably believed he had obtained the coverage represented by Defendants and relied on those representations to his detriment.

162. As a further direct and proximate result of Defendants' negligence, Plaintiff suffered damages in an amount in excess of this Court's jurisdictional minimum.

**FIFTH CAUSE OF ACTION**

**Gross Negligence**

***(Against all Defendants)***

163. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

164. Defendants USHEALTH Advisors, LLC, Freedom Life Insurance Company of America, Ferst Choice Insurance LLC, and Connor Ferst owed Plaintiff a duty to act with reasonable care,

skill, and diligence as licensed insurance producers and brokers. This duty included accurately representing the nature, scope, and limitations of the insurance products they sold and ensuring that the coverage procured matched the needs expressly communicated by the consumer.

165. Defendants breached this duty when they negligently, carelessly, and recklessly failed to procure adequate health insurance for Plaintiff and his family, despite Plaintiff's explicit request for major-medical PPO coverage and his explanation that he required comprehensive protection for his wife and two young children. Rather than securing the coverage Plaintiff requested and reasonably expected, Defendants disregarded his stated needs and placed him into a fixed-indemnity product that was incapable of providing the major-medical benefits he sought.

166. Defendants failed to exercise even slight care in the sale and procurement of insurance for Plaintiff by misrepresenting a fixed-indemnity plan as a PPO major-medical plan, falsely stating that the plan provided UnitedHealthcare Choice Plus PPO network access, falsely stating that emergency treatment would be covered under the No Surprises Act, failing to disclose that the policy was not ACA-compliant, failing to disclose that the policy did not provide major-medical benefits, and failing to provide or review the policy brochure or disclosures prior to enrollment. Ferst later admitted that he did not understand that fixed-indemnity plans do not provide PPO coverage, did not understand that the No Surprises Act did not apply, and did not know that Centennial Hills Hospital's emergency services were not covered, demonstrating a complete lack of even minimal competence.

167. Defendants' conduct demonstrated a reckless disregard for the rights and safety of Plaintiff and his family. Defendants gave little, if any, thought to the consequences of selling a non-PPO, non-major-medical plan to a family that expressly requested major-medical PPO coverage. Defendants' own correspondence reveals that they relied on inaccurate sales tools, misunderstood the product's limitations, and continued to affirm false representations even after Plaintiff began experiencing claim denials.

168. Defendants' conduct constituted gross negligence, representing a substantial deviation from the standard of care expected of licensed insurance professionals and demonstrating willful and wanton disregard for Plaintiff's interests. Defendants' actions went far beyond mere

carelessness and reflected a systemic failure to understand or communicate the most basic features of the insurance product being sold.

169. As a direct and proximate result of Defendants' gross negligence, Plaintiff suffered damages, consequential financial losses, emotional distress, and attorneys' fees and costs incurred to obtain benefits wrongfully withheld.

170. Defendants' conduct was malicious, oppressive, and in conscious disregard of Plaintiff's rights. Defendants knowingly misrepresented the nature of the coverage, concealed material facts, denied claims based on false rationales, attempted to shift blame to Plaintiff, and offered a substantial settlement despite asserting no wrongdoing. Such conduct warrants an award of punitive damages to punish and deter similar misconduct.

**SIXTH CAUSE OF ACTION**

**Fraudulent Concealment / Deceptive Trade Practices**

***(Against Defendant Connor Ferst and Ferst Choice Insurance LLC)***

171. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

172. Under NRS 598.0923 and related provisions of Nevada's Deceptive Trade Practices Act, it is a deceptive trade practice to knowingly fail to disclose a material fact in connection with the sale of goods or services, or to mislead a consumer regarding the nature of the product being sold. Insurance sales fall within the scope of these protections when an insurance producer conceals or omits material information that would affect a consumer's decision to purchase coverage.

173. Defendants Connor Ferst and Ferst Choice Insurance LLC knowingly failed to disclose material facts in connection with the sale of the insurance policy to Plaintiff, including that the policy was not major-medical insurance, not a PPO plan, not ACA-compliant, not subject to the No Surprises Act, and did not provide the PPO network access and emergency protections repeatedly represented to Plaintiff. Ferst also failed to disclose that fixed-indemnity plans do not provide contracted rates, do not provide in-network benefits, and do not provide meaningful emergency-care coverage.

174. Ferst further failed to disclose that the policy was a fixed-indemnity plan with severe limitations, including a $250 emergency-room benefit, and that it would not provide meaningful coverage for emergency medical care, hospital services, diagnostic testing, or other essential health benefits that Plaintiff expressly sought for his family.

175. Ferst's concealment of these material facts was intentional and designed to induce Plaintiff to purchase the policy and rely on the false belief that he and his family would be protected by comprehensive PPO major-medical coverage. Ferst's repeated confirmations of PPO access, in-network benefits, and emergency protections—combined with his failure to disclose the true nature of the policy—were calculated to mislead Plaintiff and secure the sale.

176. Ferst also concealed that Plaintiff never received the policy brochure, disclosures, or contract prior to enrollment, despite later claiming otherwise. By withholding these documents, Ferst prevented Plaintiff from discovering the true limitations of the product and deprived him of the opportunity to make an informed decision.

177. Plaintiff is informed and believes, and alleges, that Defendants' conduct was not isolated. Defendants have engaged in similar misrepresentations and omissions with other consumers, reflecting a pattern and practice of deceptive sales practices designed to mislead consumers regarding the nature and limitations of Defendants' insurance products.

178. A reasonable consumer in Plaintiff's position would have considered the concealed information material to the decision to purchase health-insurance coverage. Had Plaintiff been informed that the policy was a fixed-indemnity plan with minimal benefits, no PPO network, no contracted rates, and no emergency protections, he would not have purchased the policy or paid premiums totaling $21,290.40.

179. As a direct and proximate result of Defendants' fraudulent concealment and deceptive trade practices, Plaintiff suffered special damages in the form of unpaid medical expenses, loss of contractual benefits, attorneys' fees and costs, and general damages including financial loss, emotional distress, and inconvenience, all in an amount in excess of this Court's jurisdictional minimum.

180. Defendants' conduct was malicious, oppressive, and in conscious disregard of Plaintiff's rights. Ferst knowingly concealed material facts, misrepresented the nature of the coverage, denied wrongdoing despite clear evidence, attempted to shift blame to Plaintiff, and continued to affirm false statements even after Plaintiff's claims were denied. Such conduct warrants an award of punitive damages to punish and deter similar misconduct.

**SEVENTH CAUSE OF ACTION**

**Fraudulent Concealment / Deceptive Trade Practices**

***(Against USHEALTH Advisors and Freedom Life Insurance Company of America)***

181. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

182. Under NRS 598.0923 and related provisions of Nevada's Deceptive Trade Practices Act, it is a deceptive trade practice to knowingly fail to disclose a material fact in connection with the sale of goods or services, or to violate a state statute or regulation relating to the sale of goods or services. These protections apply when a seller conceals or omits information that would materially affect a consumer's decision to purchase a product, including insurance coverage.

183. Plaintiff is informed and believes, and alleges, that Defendants' conduct was not isolated. Defendants have engaged in similar misrepresentations and omissions with other consumers, reflecting a pattern and practice of deceptive sales practices designed to mislead consumers regarding the nature and limitations of Defendants' insurance products.

184. USHEALTH Advisors and Freedom Life, acting through their authorized agent Connor Ferst, knowingly failed to disclose material facts in connection with the sale of the insurance policy to Plaintiff. These concealed facts included that the policy was not major-medical insurance, not a PPO plan, not ACA-compliant, not subject to the No Surprises Act, and did not provide PPO network access, contracted rates, or emergency protections. Freedom Life later admitted that the plan was a fixed-indemnity product and that none of the PPO-related representations made by Ferst were accurate.

185. USHEALTH Advisors and Freedom Life further failed to disclose that the policy was a fixed-indemnity plan with severe limitations, including a $250 emergency-room benefit, and that

it would not provide meaningful coverage for emergency medical care, hospital services, diagnostic testing, or other essential health benefits that Plaintiff expressly sought for his family. USHEALTH Advisors and Freedom Life also failed to disclose that Plaintiff was never provided with the brochure or policy documents prior to enrollment, despite later claiming otherwise, and failed to correct Ferst's misrepresentations even after Plaintiff began experiencing claim denials.

186. USHEALTH Advisors and Freedom Life's concealment of these material facts was intentional and designed to induce Plaintiff to purchase the policy and rely on the false belief that he and his family would be protected by comprehensive PPO major-medical coverage. Freedom Life's post-claim correspondence, which attempted to rewrite the sales narrative, justify denials with contradictory explanations, and shift responsibility onto Plaintiff, further demonstrates that the concealment was deliberate and part of a broader pattern of deceptive practices.

187. A reasonable consumer in Plaintiff's position would have considered the concealed information material to the decision to purchase health-insurance coverage. Had Plaintiff been informed that the policy was a fixed-indemnity plan with minimal benefits, no PPO network, no contracted rates, and no emergency protections, he would not have purchased the policy or paid premiums totaling $21,290.40.

188. As a proximate and foreseeable result of the foregoing, Plaintiff suffered special and general damages, including but not limited to uncovered medical expenses, consequential financial losses, emotional distress, and attorneys' fees.

189. USHEALTH Advisors and Freedom Life acted fraudulently, oppressively, and in malicious disregard of Plaintiff's rights. Plaintiff therefore seeks punitive damages by way of punishment and deterrence in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

**Consumer Fraud**

***(Against All Defendants)***

190. Plaintiff restates and realleges each of the allegations contained in this Complaint as though fully set forth herein.

191. Under NRS 41.600, a victim of consumer fraud is entitled to recover damages sustained as a result of the fraud, as well as reasonable attorneys' fees. Nevada law provides broad protections to consumers who are misled or deceived in the course of a commercial transaction, including the purchase of insurance.

192. "Consumer fraud" includes any deceptive trade practice as defined in NRS 598.0915 through 598.0925, including both affirmative misrepresentations and the knowing concealment, suppression, or omission of material facts.

193. Under NRS 598.0915(15), it is a deceptive trade practice for a person, in the course of their business or occupation, to knowingly make any false representation in a transaction. This includes false statements regarding the nature, scope, adequacy, or characteristics of insurance coverage.

194. Under NRS 598.0923(1)(b)-(c), it is a deceptive trade practice to knowingly fail to disclose a material fact in connection with the sale of goods or services, or to violate a state statute or regulation relating to the sale of goods or services. Insurance carriers and their agents are prohibited from concealing material information that would affect a consumer's decision to purchase coverage.

195. Defendants USHEALTH Advisors, Freedom Life, Ferst, and Ferst Choice knowingly made false representations and knowingly failed to disclose material facts in connection with the sale of the insurance policy to Plaintiff. These concealed and misrepresented facts included that the policy was not major-medical insurance, not a PPO plan, not ACA-compliant, not subject to the No Surprises Act, and did not provide PPO network access, contracted rates, or emergency protections. Freedom Life later admitted that the plan was a fixed-indemnity product and that none of the PPO-related representations made by Ferst were accurate.

196. Defendants further failed to disclose that the policy was a fixed-indemnity plan with severe limitations, including a $250 emergency-room benefit, and that it would not provide the major-medical coverage Plaintiff expressly sought for his wife and two young children. Defendants also failed to disclose that Plaintiff was never provided with the brochure or policy

documents prior to enrollment, despite later claiming otherwise, and failed to correct Ferst's misrepresentations even after Plaintiff began experiencing claim denials.

197. A reasonable consumer in Plaintiff's position would have considered the concealed and misrepresented information material to the decision to purchase health-insurance coverage. Had Plaintiff been informed of the true nature and limitations of the policy, he would not have purchased it or paid premiums totaling $21,290.40.

198. Plaintiff is informed and believes, and alleges, that Defendants' conduct was not isolated. Defendants have engaged in similar misrepresentations and omissions with other consumers, reflecting a pattern and practice of deceptive sales practices designed to mislead consumers regarding the nature and limitations of Defendants' insurance products.

199. As a direct and proximate result of Defendants' deceptive trade practices and consumer fraud, Plaintiff suffered special and general damages, including but not limited to uncovered medical expenses, consequential financial losses, emotional distress, and attorneys' fees.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

200. Freedom Life and Ferst acted fraudulently, oppressively, and in malicious disregard for the rights of Plaintiff. Plaintiff therefore seeks punitive damages by way of punishment and deterrence in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

1. For damages in excess of $15,000 and in such amounts as may be proved at trial;
2. For costs and attorney fees incurred in connection with this action;
3. For special and consequential damages in an amount to be proved at trial;
4. For prejudgment and post judgment interest on all sums awarded, according to proof at the maximum legal rate;
5. For punitive damages in such amounts as may be proved at trial; and,
6. For such and further relief as the Court deems just and appropriate.

**AFFIRMATION**

**(NRS 239B.030)**

The undersigned does hereby affirm that the preceding document does not contain any personal information.

DATED: February 27, 2026

LEVERTY & ASSOCIATES LAW CHTD.

Patrick R. Leverty, Esq.
608 Lander Street
Reno, NV 89509
*Attorney for Plaintiff Robert Kent Walls*

# EXHIBIT B

EXHIBIT B

EXHIBIT B

Electronically Filed
4/23/2026 11:43 AM
Steven D. Grierson
CLERK OF THE COURT

Patrick R. Leverty, Esq., NV Bar No. 8840
LEVERTY & ASSOCIATES LAW CHTD
3100 W. Charleston Blvd., Suite 200
Las Vegas, NV 89102
Ph. (702) 507-0201

MAILING ADDRESS
832 Willow Street
Reno, Nevada 89502
Ph: (775) 322-6636

*Attorneys for Plaintiff Robert Kent Walls*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

ROBERT KENT WALLS, an individual,

Plaintiffs,

vs.

CONNER FERST; FERST CHOICE INSURANCE LLC; USHEALTH ADVISORS LLC; FREEDOM LIFE INSURANCE COMPANY OF AMERICA; DOES I through X; and ABC CORPORATIONS A-Z; inclusive,

Defendants.

CASE NO.: A-26-940497-C

DEPT. NO.: 23

**PROOFS OF SERVICE**

Proofs of Service for:

- Freedom Life Insurance Company of America (Exhibit 1)
- USHealth Advisors, LLC (Exhibit 2)

DATED: April 23, 2026.

LEVERTY & ASSOCIATES LAW CHTD.

*/s/ Patrick R. Leverty*
Patrick R. Leverty, Esq.
832 Willow Street
Reno, NV 89502
*Attorneys for Plaintiff*

# EXHIBIT 1

EXHIBIT 1

**PROOF OF SERVICE**

I certify, under penalty of perjury, that on March 31, 2026, at 8:04 a.m., the Nevada Commissioner of Insurance was personally served, as statutory attorney, with a copy of the Summons and Complaint in Robert Kent Walls v. Conner Ferst, et al., Case No. A-26-940497-C, District Court, Clark County, Nevada. On this day, I have served a copy of the foregoing by mailing the copy thereof, by First Class mail, to the following:

FREEDOM LIFE INSURANCE COMPANY OF AMERICA
CT Corporation System
701 S Carson St
Carson City NV 89701

This 31st day of March 2026.

/s/ Melanie Lyons
Employee of the State of Nevada
Nevada Division of Insurance

State of Nevada, Division of Insurance
The document on which this certificate is stamped is a full, true and correct copy of the original

Date: 3-31-2026 By: M Lyon

# EXHIBIT 2

EXHIBIT 2

**PROOF OF SERVICE**

I certify, under penalty of perjury, that on March 31, 2026, at 8:04 a.m., the Nevada Commissioner of Insurance was personally served, as statutory attorney, with a copy of the Summons and Complaint in Robert Kent Walls v. Conner Ferst, et al., Case No. A-26-940497-C, District Court, Clark County, Nevada. On this day, I have served a copy of the foregoing by mailing the copy thereof, by First Class Mail, to the following:

USHEALTH ADVISORS, LLC
300 BURNETT ST., STE. 200
FORT WORTH, TX 76102

This 31st day of March 2026.

/s/ Melanie Lyons
Employee of the State of Nevada
Nevada Division of Insurance

State of Nevada, Division of Insurance
The document on which this certificate is stamped is a full, true and correct copy of the original

Date: 3-31-2026 By: M Lyon

# EXHIBIT C

EXHIBIT C

EXHIBIT C

Electronically Filed
3/31/2026 7:05 PM
Steven D. Grierson
CLERK OF THE COURT

CNND

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| Robert Walls, Plaintiff(s)<br>vs.<br>Connor Ferst, Defendant(s) | A-26-940497-C<br>Department 23 |

## CLERK'S NOTICE OF NONCONFORMING DOCUMENT

Pursuant to Rule 8(b)(2) of the Nevada Electronic Filing and Conversion Rules, notice is hereby provided that the following electronically filed document does not conform to the applicable filing requirements:

| | |
|---|---|
| Title of Nonconforming Document: | Complaint |
| Party Submitting Document for Filing: | Plaintiff |
| Date and Time Submitted for Electronic Filing: | 2/27/2026 at 3:37 PM |

☒ The document initiated a new civil action and a cover sheet was not submitted as required by NRS 3.275.

Pursuant to Rule 8(b)(2) of the Nevada Electronic Filing and Conversion Rules, a nonconforming document may be cured by submitting a conforming document. All documents submitted for this purpose must use filing code "**Conforming Filing – CONFILE**." Court filing fees will not be assessed for submitting the conforming document. Processing and convenience fees may still apply.

Dated this: 31st day of March, 2026

By: /s/ Ondina Amos
Deputy District Court Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I concurrently filed and served a copy of the foregoing Clerk's Notice of Nonconforming Document, on the party that submitted the nonconforming document, via the Eighth Judicial District Court's Electronic Filing and Service System.

By: /s/ Ondina Amos
Deputy District Court Clerk